**Opinion issued December 28, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00748-CR

_____

**JOHN ALBERTO ROMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 25th District Court
Colorado County, Texas
Trial Court Case No. 20-153

## MEMORANDUM OPINION

A jury convicted Appellant John Alberto Roman of aggravated robbery and unlawful possession of firearm by a felon. After finding an enhancement allegation true, the jury assessed Appellant's punishment at 99 years' confinement for the aggravated robbery offense and 10 years' confinement for the offense of unlawful

possession of firearm by a felon, both to be served in the Texas Department of Criminal Justice—Institutional Division.

On appeal, Appellant argues (1) the trial court barred him from asserting his rights under the Confrontation Clause of the Sixth Amendment by admitting out-of-court statements from a witness who was not available to be cross-examined under the doctrine of forfeiture by wrongdoing, and (2) the trial court erred by failing to include a verdict sheet for the lesser included offense of aggravated assault.

We affirm.

## Background

On October 16, 2020, 58-year-old Craig Anthony Wilson was shot in the shoulder. A grand jury indicted Appellant John Alberto Roman for three offenses stemming from Wilson's shooting: (1) aggravated assault, (2) aggravated robbery, and (3) felon in possession of a firearm. Roman's case proceeded to a jury trial.

## A. Craig Anthony Wilson

Wilson, the complainant, testified that he texted 17-year-old Bre'Andrea Wiley when he got off of work on October 16, 2020, and he asked Wiley if he could come visit her. Wiley told Wilson he could stop by her apartment building in Columbus, Texas. Wilson acknowledged the purpose of his visit was to pay Wiley to have sex with him in his SUV. According to Wilson, Wiley had texted him the

night before and told him she needed money to get her hair done and she wanted to have sex with him.

When Wilson arrived at Wiley's apartment building, he parked his SUV in the parking lot, and he waited for Wiley. Wilson had already put the SUVs backseats down in anticipation of his meeting with Wiley. According to Wilson, Wiley came out of her apartment almost immediately and she was carrying something he believed to be a towel in her hand. Wiley kept looking behind her as she approached Wilson's SUV. Wiley first attempted to open the rear passenger-side door of the SUV, but it was locked. She then got into the front passenger seat, and she reached back and unlocked the rear passenger-seat door. According to Wilson, Wiley did not close her door or answer when he asked her why she unlocked the back door.

Appellant John Alberto Roman, who had a taser in his hand, jumped in the SUV through the unlocked rear passenger-side door, tased Wilson's shoulder and asked Wilson, "Where's the money at?" Wilson, who thought the taser[1] was a gun, jumped into the backseat with Roman to try to get the taser from him. Roman dropped the taser during his struggle with Wilson. Roman then reached behind him and pulled out a pistol. Roman and Wilson began struggling over the pistol. According to Wilson, Roman intentionally shot at him twice while they were struggling, and one bullet struck Wilson in the shoulder. After shooting Wilson,

---

[1]     The taser was located on the end of a long baton, referred to as a stun baton.

3

Roman climbed out of the SUV through the rear passenger-side door and ran away. Wiley was no longer in the SUV and Wilson did not know when she left.

Wilson testified he knew the man who shot him was Roman because he had known Roman for several years, and he saw Roman's face and recognized his voice. According to Wilson, Roman was wearing a cap and some silver-looking, square glasses when he climbed in the SUV. Wilson testified he never asked Roman to get into his SUV.

After Roman ran away, Wilson climbed back into the driver's seat and drove to his home. When he arrived at home, Wilson inspected his SUV for damage and he collected the stun baton Roman had used, Roman's cap and eyeglasses, and a fired gun shell from off the floorboard. Wilson put the taser, cap, and glasses in the SUV's cargo area and he threw the shell in the trash inside his home. Wilson told his wife, Vernita, that someone had just shot him in the shoulder when he got out of his SUV. Wilson testified he lied to Vernita because he did not want her to know he had been paying Wiley to have sex with him. Neither Wilson nor Vernita called the police to report the shooting.

Vernita took Wilson to the Columbus Community Hospital emergency room and someone at the hospital notified the Colorado County Sheriff's Office that Wilson had been shot. When the responding officers questioned Wilson about his gunshot wound, Wilson told them he had been shot while standing in his yard after

4

he got home from work.  He did so because he did not want Vernita to know about his sexual relationship with Wiley.  After inspecting Wilson's SUV and the outside of his home where he allegedly had been shot, the officers told Wilson, who was still in the hospital, that his story was not "adding up."  At that point, Wilson admitted lying to the officers and Vernita about the shooting.  He identified Roman as the shooter.  Wilson also identified Roman in court as the person who demanded money from him and then shot him in the shoulder.

On cross-examination, Wilson admitted he had paid Wiley for sex on four or five prior occasions after her seventeenth birthday.  Wilson denied ever going inside Wiley's apartment and insisted that he and Wiley only had sex in his SUV.

**B.      Deputy Andrew Lopez and Deputy Ryan Ohl**

On October 16, 2020, Deputy Andrew Lopez, Deputy Josh Solis, and Deputy Ryan Ohl with the Colorado County Sheriff's Office responded to a call at the Columbus Community Hospital regarding a gunshot victim.  Deputy Lopez, who met with Wilson and Vernita at the hospital, testified that Wilson had a gunshot wound on the top left of his shoulder that was bleeding and appeared "fresh."  Wilson told Deputy Lopez that someone had shot him while he was standing outside his home, but he did not know the shooter's identity.

Deputy Solis and Deputy Ohl went to Wilson's home to inspect the alleged crime scene while Deputy Lopez talked to Wilson and Vernita at the hospital.  Other

than a small amount of blood on a rock in the driveway, Deputy Solis and Deputy Ohl did not find any shell casings or other evidence indicating that the shooting had occurred at that location, as Wilson claimed. After they reported their findings to Deputy Lopez, Deputy Lopez briefly inspected Wilson's SUV, which was parked at the hospital. Deputy Lopez testified there were three bullet indentations in the rear driver's side door, and a "profuse" amount of blood on the SUV's driver's seat, dashboard, front passenger seat, back seat, and in the cargo area. Based on his observations, Deputy Lopez concluded the shooting had occurred inside Wilson's SUV, not outside Wilson's home as Wilson claimed.

Deputy Ohl corroborated Deputy Lopez's testimony regarding their investigation of Wilson's home and SUV. Deputy Ohl testified that he and Deputy Solis did not find any evidence that a shooting had occurred outside Wilson's home. After inspecting the outside of Wilson's vehicle, Deputy Ohl concluded the shooting had occurred inside the SUV.

## C. Detective William Moulder

The Columbus Police Department took the investigation over from the Sheriff's Office after Wilson admitted that the shooting had occurred inside Wilson's SUV, while parked outside Wiley's apartment building in Columbus, Texas. Detective William Moulder with the Columbus Police Department began his investigation by going to the Colorado County Sheriff's Office to gather information

6

and inspect Wilson's SUV. According to Detective Moulder, 17-year-old Wiley was inside Wilson's SUV when Roman shot Wilson. Detective Moulder knew Roman and identified Roman in the courtroom. Detective Moulder testified that he saw blood in the SUV's interior and an indentation in the rear driver's side door panel indicating that a bullet had struck the inside of the door. Detective Moulder also inspected the parking lot of Wiley's apartment building, but he did not find any evidence of a crime occurring at the scene.

Detective Moulder then spoke to Wilson and Vernita at the hospital and photographed Wilson's injuries. Wilson told Moulder that Roman had never been inside the SUV before the shooting, and he gave Detective Moulder consent to search his SUV and cell phone.[2] Detective Moulder found evidence that three bullets had been fired inside Wilson's SUV, and he collected several items from the SUV's cargo area including eyeglasses, a stun baton, and a black baseball hat.

The stun baton, eyeglasses, and black baseball cap were sent to the Texas Department of Public Safety Crime Lab for processing, along with blood samples Moulder had collected from the SUV's interior, DNA samples from Wilson and Vernita, and buccal swabs taken from Roman. Detective Moulder also dusted the

---

[2] Wilson had deleted his text messages with Wiley, and Moulder was not able to retrieve the information from Wilson's cell phone. Although Vernita gave Detective Moulder the shell casing Wilson had thrown away, Detective Moulder did not submit the shell casing for forensic analysis because no firearm was recovered during the investigation and the shell casing itself had been tainted.

7

rear passenger side door for fingerprints, but no fingerprints were recovered from Wilson's SUV or any of the evidence Moulder collected from the vehicle.

## D.    Investigator Keith Webb

Keith Webb, an investigator with the Colorado County Attorney's Office, prepared a search warrant for Roman's DNA.  The search warrant and Webb's probable cause affidavit were admitted into evidence without objection as State Exhibit 63.  In his affidavit, Webb stated:

> Columbus Police Detective [William] Moulder took a statement from Craig Wilson who told him that a 17-year-old female named Bre'Andrea Wiley contacted him asking him for some money so she could get her hair fixed. She told Wilson to meet her at the Preston Apartments. When Wilson arrived Wiley got into the front passenger seat and then she reached into the back seat and unlocked the rear passenger door. Then 35-year-old John Alberto Roman opened the rear passenger door and got inside.
>
> Wilson said that he recognized Roman and has known him for several years. Roman immediately yelled at Wilson, "Where is the money?" Roman was holding a long black flashlight taser, which he used to shock Wilson with. Wilson began fighting with Roman and ended up in the backseat where he was able to take the taser device away from him. Then Roman pulled out a semi-auto pistol.
>
> Wilson dropped the taser then he began trying to take the pistol away from Roman. During the struggle Roman discharged the pistol three (3) times with one of the bullets hitting him in the shoulder. After the shooting Roman exited the vehicle and ran away.
>
> . . .
>
> A search of the interior of the vehicle located several fired bullet fragments, a black baseball cap and prescription eyeglasses believed to belong to Roman. Detective Moulder also located and recovered a

8

"Streetwise Police Force" brand taser that is marketed as being a flashlight, a baton striking weapon and a high voltage stun weapon.

In his probable cause affidavit, Webb also stated that Wiley had given a sworn statement. Webb stated:

> Columbus Police Captain Wendy Alley took a sworn statement from Bre'Andrea Wiley. Wiley told Alley that she has been dating Roman for a while and he had become angry when he learned that Wilson had been communicating with her. Roman had Wiley contact Wilson to arrange a meeting because he was going to make Wilson "come to an understanding about stopping him from calling her". Wiley told Alley that she knew he had a pistol but didn't know anything about him having a taser. Roman had told Wiley to bring a towel when she went to Wilson's vehicle so he could wrap up his pistol with it when he was through. Roman later told Wiley that he would break her jaw and leave her paralyzed if she told the police what he had done.

## E.    Julia Yip

Julia Yip, a forensic scientist with the DPS Crime Lab, compared known DNA samples from Roman, Wilson, and Vernita with the two samples of DNA located on the black baseball cap found in Wilson's SUV. Yip testified the hat contained a mixture of DNA from at least three different individuals, at least one of whom was male. According to Yip, the probability that the DNA profile on the hat:

> came from Craig Wilson, John Roman, and one unrelated individual, is 66.9 quattuordecillion times greater than the probability of this profile, if the DNA came from three unrelated, unknown individuals. This likelihood ratio indicates support for the proposition that Craig Wilson and John Roman are possible contributors to the profile.

Yip further testified:

9

the probability of the profile if the DNA came from John Roman and two unknown individuals is 698 septillion times greater than the probability of this profile if the DNA came from three unrelated, unknown individuals; and for Craig Wilson, the probability of this profile, if the DNA came from Craig Wilson and two unknown individuals is 343 quadrillion times greater than the probability of this profile if the DNA came from three unrelated, unknown individuals. So 698 septillion is a bigger number than 343 quadrillion.

She further testified:

So the probability of this profile from the portion of the swabbings from the black hat, if the DNA came from John Roman and two unknown individuals, is 698 septillion times greater than the probability of this profile, if the DNA came from three unrelated, unknown individuals; and for the comparisons to Craig Wilson, the probability of the profile, if the DNA came from Craig Wilson and two unknown individuals, is 343 quadrillion times greater than the probability of this profile if the DNA came from three unrelated, unknown individuals. And 698 septillion is a larger number than 343 quadrillion.

In other words, Roman and Wilson were possible contributors to the DNA on the black hat found in Wilson's SUV and the probability that the DNA came from Roman and two unknown individuals was greater than the probability that it came from Wilson and two unknown persons.

## F.     Captain Wendy Alley

Captain Wendy Alley with the Columbus Police Department showed a photo array to Wilson, and Wilson identified Roman as the person who shot him in the shoulder. Wilson told Captain Alley that he was "100 percent sure."

At that point in Captain Alley's testimony, the State requested a hearing to determine whether the doctrine of forfeiture by wrongdoing barred Roman from

10

objecting to the admission of Wiley's out-of-court statements based on the Sixth Amendment's Confrontation Clause. During the hearing, the State presented testimony from Captain Alley and Wiley's mother Laquida Sewell.[3] After hearing the testimony and arguments from Roman and the State, the trial court found by a preponderance of the evidence that the forfeiture by wrongdoing doctrine, codified in Article 38.49 of the Texas Code of Criminal Procedure, applied and Roman was thus prohibited from asserting his constitutional right to confront Wiley.

Wiley's written statement, given to Captain Alley on October 19, 2020, was redacted. The redacted statement was admitted as State Exhibit 66 and submitted to the jury. When the State offered the redacted version of Wiley's written statement into evidence, Roman objected to the admission of the statement on the grounds that "[i]t is hearsay," its admission "violates the Sixth Amendment confrontation clause," and it "unfairly prejudiced [Roman] by the surprise of the statement coming in with the witness not being available." The trial court admitted the redacted statement over Roman's objection.

When Captain Alley's testimony resumed, she read Wiley's redacted written statement to the jury.

> I know Craig Wilson through mutual friends for around three years. I know John Roman by babysitting his kids. [Roman] had a Halloween party in 2018, and Craig started flirting with me and asked me to meet

---

[3]     We discuss Captain Alley's and Sewell's hearing testimony below in the "Texas Code of Criminal Procedure Article 38.49 Hearing" section of this opinion.

11

up with him. We met at my apartment at my parking lot, and he drove a red Mustang. We had sex in the back seat. He gave me $30 and told me not to tell anybody because I was too young. Craig and I had met up around five to six times a week. I would either perform oral sex or sex, and he would give me money. He would always wear a condom if we had sex, and we would always have sex in my apartment parking lot. Craig would sit in the driver's seat to put on the condom, then get into the back seat.

Around a year ago, when I was still 16 years old, I started having sexual relationship with [Roman]. I call him Rico. [Roman] knew I was 16, but he didn't care. [Roman] and I would have sex at his house by the junior high. When [Roman] and I had sex, he would never wear a condom.

In April of this year, Craig picked me up from work at Burger King. It was around 11:00 p.m. Craig took me to my apartment. Usually when Craig gives me a ride home from work I give him a blow job. On this night I wasn't feeling it, so I just got out and walked into my apartment. I did not lock the door behind me. My mom and sister were not home. I walked into my mom's bedroom. I was sitting in my mom's bed, and I still had on my work clothes. Craig came inside without permission. I asked him what he was doing, and I smelled the beer on his breath. Craig started unbuttoning my high-waisted jeans. Craig told me "Come on, baby." Craig got my pants and panties off and forced his penis into my vagina. Craig went like four strokes. I told him to stop. He did. Craig put his shorts back on. I stayed on the bed. Craig walked outside, and I hurried up and locked it behind him. Craig raped me.

I didn't tell anyone, but a week later I told [Roman]. [Roman] seemed surprised and didn't really say anything. He took me home. [Roman] and I had not talked about the rape since then except for the night he shot Craig. On that day [Roman] told me to text Craig. He told me to text him that I would have sex with him, but because I was on my period, I would give him head, then have sex with him when I was off my period for $140, so that I could get my hair done. [Roman] told me he was going to bust Craig in the ass. I knew [Roman] had the gun, but not the taser. I never thought [Roman] would shoot Craig. [Roman] said he was going to make Craig come to an understanding about stopping him from reaching out to me or calling me.

12

The plan was that I would get in the front passenger seat and Craig would be in the driver's seat like he usually is to put a condom on, but Craig was already in the back seat when I sat down in the front passenger seat. When I walked out, I had a blue towel with me in my hands. [Roman] had told me to take it with me so he could wrap the gun with it. So when [Roman] got in the back passenger seat Craig was in the back seat with him. They started wrestling in the back seat, but it was dark so I could not see. I heard like three gunshots. [Roman] yelled at me to open his door. He was locked inside, so I did. Then I ran by a little red car in the parking lot. [Roman] got out, and I saw the gun in his hands. Craig drove off.

[Roman] told me that if the cops come, to tell them that Craig had raped me. [Roman] left. He later picked me up around 2:00 a.m. We went to his house, and he dropped me back off around 5:00 a.m. After that I was trying to avoid [Roman], but on Sunday, the 25th, [Roman] picked me up from my apartment and took me to one of his houses right by the junior high and was telling me that he was going to move me in with him. Then he started in asking me about all of these dudes I was with, but I wasn't.

[Roman] slapped me twice in my face, and it hurt me. I was shaking. I was so scared. This wasn't the first time [Roman] has hit me. [Roman] was telling me that he was going to break my jaw and paralyze me if I told anybody about what we were talking about. He kept asking me to name all of the guys I've slept with. I kicked off my shoes and ran to my friend Shatyra Scott's house to get away from him. I told Shatyra that I was running from [Roman]. [Roman] had my cell phone in his pocket, so now he has it. [Roman] calls my sister's phone and says I need to get myself together and says he's been watching me. Now I'm scared to even go outside, and I quit my job, too. [Roman] said if I tell the police about the shooting, that he has bail money. I don't know where the gun is.

## G.    Closing Arguments

In its closing argument, the State argued that Wilson's testimony provided direct evidence that Roman had committed aggravated robbery when he demanded

13

money from Wilson and shot him in the shoulder. The State argued that Wilson's testimony was corroborated by Wiley's out-of-court statement, Wilson's gunshot wound, and the physical evidence collected from inside the SUV, including the DNA found on the black baseball cap. According to the State:

> Three bullet holes corroborate[] what Craig Wilson testified, and it corroborates what [Wiley] said in her statement. There is a taser in the vehicle. That corroborates, and there was a bullet casing found in the vehicle. It corroborates Craig Wilson's testimony.

The State argued there was also circumstantial evidence of Roman's guilt, stating:

> Detective Moulder's testimony about what the physical evidence showed. He processed it, and then based on what he saw, he came to a conclusion based on his training and his experience that there was a struggle that occurred in that vehicle, exactly like Craig Wilson said. Someone was shot. There was no evidence outside the vehicle or in the parking lot. That's because everything happened inside the car. And there is evidence from the witness stand that there were shots heard being fired a little after midnight, if y'all will remember that, near the Preston Street Apartments. The probabilities that that DNA off of that cap from John Roman and two unknown individuals is that much greater than that it came from Craig Wilson and two unknown individuals. . . And it's a reasonable conclusion or a reasonable deduction from that evidence that the cap was worn by John Roman. It corroborates what Craig Wilson testified to, that John Roman left that hat in his vehicle on October the 16th, 2020.

The State, who acknowledged Wilson had lied to the police and his wife about the shooting and his sexual relationship with Wiley, argued:

> We're not saying that Craig Wilson is a good person. This case is the State versus John Roman. It is not about Craig Wilson versus John Roman. We don't pick our victims or the crimes that are committed in Colorado County. Justice is blind.

14

As the State had anticipated, Roman's closing argument focused extensively on Wilson's character flaws, criminal conduct, and the credibility of his testimony. Notably, one piece of evidence Roman relied on to make his case to the jury was Wiley's out-of-court statement, which provided the only evidence that Wilson had sexually assaulted Wiley and paid her for sex when she was sixteen years old. Relying on Wiley's out-of-court statement, Roman argued that Wilson had not only lied to the police and his wife, he also lied to the jury about his relationship with Wiley:

> Here's a man who came into court, who lied under oath to your faces. He said "I did not begin to sleep with this girl when she was 16. I had never been to her home, and I did not rape her." We now know he did. And in a remarkable question mark we have a man who is engaging in prostitution or sex trafficking, a man who lied to the police under oath, a man who raped a young girl, and also engaged in sex with a minor. All crimes. And for some strange reason, this man has not been criminally charged. This man is still in the community, doing whatever he does to whomever apparently he wants, that he can find. He wasn't charged with prostitution. He wasn't charged with lying under oath to the police. It's amazing.

Roman also argued that the only evidence a robbery had occurred was Wilson's testimony that Roman had tased him and demanded money. According to Roman, Wilson's robbery claim was part of the "barrage of lies" he had concocted in a desperate attempt to cover up his own wrongdoing, as demonstrated by the fact Wiley never mentioned a robbery in her statement. Roman argued:

> The person who has absolutely no credibility at all is Craig White -- Wilson. Do you realize that the only person, the only person, who said

15

that this was about a robbery, that this was someone demanding money, the only person who said that is Craig Wilson. When you look at [Wiley's] statement in its entirety, there is not one mention of a robbery or a demand for money or property, so why did that story come up about a robbery?

Roman's counsel then asked the jury to return a verdict of not guilty on all counts because:

It's the right thing to do. As the conscience of the community, if you do anything else other than that, you have endorsed, encouraged, supported Craig Wilson, the rapist, the liar, the person who engages in prostitution.

Roman's counsel further argued, "The greatest miscarriage of justice in this case would be to lend by a verdict your encouragement or support, your applause, your consent, to a person like Craig Wilson.  Let's not do that.  We can't do that."

In its rebuttal, the State argued that neither Roman nor Wilson were innocent parties and although Wilson had not been prosecuted for his alleged crimes, it was possible he would be charged in the future.  The State argued that the only issue before the jury was "whether or not John Roman shot [Wilson] during the course of a robbery."  The State also argued that Wiley's out-of-court statement corroborated Wilson's testimony that Roman had attempted to rob him because her claim that Roman instructed her to tell Wilson to bring money with him supported an inference that a robbery had occurred.

The jury found Roman guilty of aggravated robbery and unlawful possession of firearm by a felon.  At the conclusion of the punishment hearing, the jury found

16

the allegation that Roman had previously been convicted of the felony offense of aggravated robbery to be true.[4] It then assessed Roman's punishment for the aggravated robbery offense at 99 years' incarceration and for the unlawful possession of firearm by a felon offense at 10 years' incarceration. The trial court signed two judgments consistent with the jury's verdict, found that a deadly weapon had been used during the commission of the aggravated robbery, and ordered both sentences to run concurrently.

This appeal followed.

## Forfeiture by Wrongdoing

In his first issue, Roman argues the trial court abused its discretion in holding the doctrine of forfeiture by wrongdoing barred him from asserting his rights under the Sixth Amendment's Confrontation Clause with respect to the admission of Wiley's out-of-court statements into evidence. The State responds that Roman waived this issue due to inadequate briefing, and even if not waived, his issue fails because there is sufficient evidence supporting the trial court's holding that the doctrine of forfeiture by wrongdoing barred Roman from objecting to the admission of Wiley's out-of-court statements based on the Confrontation Clause and that the statements were admissible. The State further contends that even if the trial court abused its discretion, the error was harmless.

---

[4] Roman pleaded "true" to the enhancement paragraph.

17

## A. Standard of Review and Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees an accused the right to confront the witnesses against him. *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). Under the Confrontation Clause, "testimonial" statements—statements that were made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial—are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.*

One exception to the Confrontation Clause is the doctrine of forfeiture by wrongdoing. Under that doctrine, a defendant is barred from objecting to a witness' out-of-court statements based on the Confrontation Clause when he wrongfully procures the witness' unavailability at trial.[5] *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). This exception applies only when the defendant "engaged in conduct designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359, 365 (2008) (explaining that absence of forfeiture rule for such conduct "would create an intolerable incentive for defendants to bribe,

---

[5] The doctrine of forfeiture by wrongdoing also bars a defendant from objecting to a witness' out-of-court statements based on the hearsay rule. *See Colone v. State*, 573 S.W.3d 249, 265 (Tex. Crim. App. 2019) (stating doctrine of forfeiture by wrongdoing "trumps the hearsay rule" and defendant's conduct "logically relinquishes any right conferred by the hearsay rule").

18

intimidate, or even kill witnesses against them"). The doctrine of forfeiture by wrongdoing is based on the principle that tampering with a witness "should . . . estop the tamperer from making any objection based on the results of his own chicanery." *Colone*, 573 S.W.3d at 264 (quotation omitted); *see generally Davis v. Washington*, 547 U.S. 813, 833 (2006) (stating doctrine of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds and noting that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.").

Texas Code of Criminal Procedure Article 38.49 codifies the doctrine of forfeiture by wrongdoing. It states that

> (a)   A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> > (1)   may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> >
> > (2)   forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.
>
> (b)   Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are

19

admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

(c)    In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code[6] and Rule 104, Texas Rules of Evidence.[7]

(d)    The party offering the evidence or statements described by Subsection (b) is not required to show that:

    (1)    the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability;

    (2)    the actions of the actor constituted a criminal offense; or

    (3)    any statements offered are reliable.

(e)    A conviction for an offense under Section 36.05 or 36.06(a), Penal Code, creates a presumption of forfeiture by wrongdoing under this article.[8]

(f)    Rule 403, Texas Rules of Evidence, applies to this article.[9] This article does not permit the presentation of character evidence that

---

[6]    Article 28.01 addresses what matters may be heard during a pretrial hearing. TEX. CODE CRIM. PROC. art. 28.01.

[7]    Texas Rule of Evidence 104 addresses preliminary questions the trial court decides, such as whether a witness is qualified, whether a privilege exists, or whether evidence is admissible. TEX. R. EVID. 104(a).

[8]    TEX. PENAL CODE § 36.05(a) (witness tampering); *id.* § 36.06(a) (obstruction or retaliation).

[9]    Texas Rule of Evidence 403 states that a trial court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403.

would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. art. 38.49.

Incidents of domestic violence perpetrated by a defendant against the witness whose out-of-court statements the State seeks to admit "may sometimes be relevant to determin[e] whether [the defendant's] particular conduct was designed to prevent a witness from testifying." *Brown v. State*, 618 S.W.3d 352, 356 (Tex. Crim. App. 2021) (citing *Giles*, 554 U.S. at 377); *see also Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at *72 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (mem. op., not designated for publication) ("[T]he domestic-violence context is particularly suitable for the application of the forfeiture by wrongdoing doctrine."). But evidence the defendant committed domestic violence against the witness in the past, standing alone, does not show that a defendant caused the victim to be absent from trial. *Brown*, 618 S.W.3d at 358 (holding "there needs to be more than simply the past commission of family-violence assaults to show causation," such as commission of "offense that necessarily causes a victim's absence," or evidence defendant threatened or engaged in conduct otherwise designed to control witness).

Because the doctrine of forfeiture by wrongdoing concerns the admission of otherwise inadmissible evidence, we review a trial court's admission of evidence under the doctrine for abuse of discretion. *See Shepherd v. State*, 489 S.W.3d 559, 572 (Tex. App.—Texarkana 2016, pet. ref'd). We will uphold the trial court's ruling

if there is some evidence to support the trial court's decision and it is correct under any theory of law applicable to the case. *See Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (stating appellate courts must uphold evidentiary rulings if they are correct under any theory of law supported by record regardless of what reason trial court gives); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (stating trial court does not abuse its discretion by admitting evidence if there is some evidence to support trial court's decision). Direct and circumstantial evidence may be used to establish the defendant's wrongful conduct caused a witness' unavailability. *See Brown*, 618 S.W.3d at 357 ("[C]ourts have recognized that procurement or causation need not be proven directly, but may be established by inference."). If the trial court does not issue findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume the court made findings that are supported by the evidence. *Shepherd*, 489 S.W.3d at 572–73; *see also Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *6 (Tex. App.—Fort Worth Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication) (stating that during Article 38.49 hearing, trial court is sole trier of fact and judge of credibility of witnesses and weight given their testimony). "When assessing evidence regarding acts alleged to have procured a witness' unavailability, we draw all reasonable inferences in favor of the trial court's finding." *Byrd v. State*, No. 07-20-00234-CR, 2022 WL 2719060, at *6 (Tex. App.—Amarillo July 13,

22

2022, pet. ref'd) (mem. op., not designated for publication) (citing *Brown*, 618 S.W.3d at 355).

If the trial court abuses its discretion by holding the forfeiture by wrongdoing doctrine applies and admitting a witness' out-of-court statement over a defendant's Confrontation Clause objection, the error is not reversible unless it was harmful. A Confrontation Clause violation is constitutional error that requires reversal unless we conclude beyond a reasonable doubt that the error was harmless. *See Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016); *see* TEX. R. APP. P. 44.2(a) (setting forth standard for constitutional error).

When applying the harmless error test for constitutional errors under Rule 44.2(a), courts must "ask whether there is a 'reasonable possibility' that the error might have contributed to the conviction." *Love*, 543 S.W.3d at 846 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)). The analysis should not focus on the propriety of the outcome. *Id.*; *see also Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) ("[T]he question for the reviewing court is not whether the jury verdict was supported by the [other] evidence."). Rather, "the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Scott*,

227 S.W.3d at 690 (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)).

When deciding whether an error of constitutional dimension contributed to the conviction, courts evaluate the entire record in a neutral manner and consider any and every circumstance apparent in the record that logically informs the harmless error determination. *Love*, 543 S.W.3d at 846. In doing so, courts may consider non-exclusive factors, such as the evidence's importance to the State's case, whether the evidence was cumulative of other admissible evidence, the presence or absence of evidence corroborating or contradicting the out-of-court statement, and the overall strength of the State's case. *Davis v. State*, 203 S.W.3d 845, 850 (Tex. Crim. App. 2006).

**B.    Texas Code of Criminal Procedure Article 38.49 Hearing**

During Captain Alley's testimony, the State requested an Article 38.49 hearing to determine whether Roman was barred from objecting to the admission of Wiley's out-of-court statements based on the doctrine of forfeiture by wrongdoing. As required by Article 38.49, the trial court conducted a hearing outside the presence of the jury. TEX. CODE CRIM. PROC. art. 38.49(c).[10] During the hearing, the State presented testimony from Captain Alley and Wiley's mother Laquida Sewell.

---

[10]    Article 38.49(c) provides that "[i]n determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the

24

### 1. Captain Wendy Alley

Captain Alley interviewed Wiley on October 29, 2020, 13 days after the shooting. During the interview, Wiley told Captain Alley:

> John Roman had assaulted her by slapping her in the face, which caused her pain, as he was asking her about her sexual partners that she had had in the past. She told me that John Roman told her that he would break her jaw and paralyze her if he—if she told anyone about the conversations that they had and went on to say that if she told anyone about the shooting that he had bail money.

When asked if Wiley appeared to be frightened during the interview, Captain Alley testified, "Absolutely." Captain Alley stated that although a subpoena had been issued for Wiley, Wiley had not been served with the subpoena because the Columbus Police Department had not been able to locate her. The record reflects that subpoenas were issued for Wiley at three different addresses on February 17, 2022. The State asked the trial court to take judicial notice of the "absence of returns associated with subpoenas."

Captain Alley testified that Wiley is listed as a missing person on the National Missing and Unidentified Persons System (NamUs).[11] A printout of Wiley's NamUs

---

presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code and Rule 104, Texas Rules of Evidence." TEX. CODE CRIM. PROC. art. 38.49(c).

[11] NamUs "is a national centralized repository and resource center for missing, unidentified, and unclaimed person cases across the United States." Home | NamUs (ojp.gov).

information was admitted into evidence for purposes of the hearing as State Exhibit 67. According to State Exhibit 67, Wiley, who was added to NamUs on March 15, 2022, had not been in contact with anyone since January 12, 2022, and "foul play is suspected in her disappearance." NamUs reflects that after a report was filed with the Houston Police Department on January 21, 2022, HPD opened an investigation into Wiley's disappearance under HPD, Case Number 92993-22. According to Captain Alley, HPD was investigating Wiley's disappearance as a possible homicide.

Captain Alley also testified that Roman had a pending charge in Harris County, Texas for the felony offense of possession of a controlled substance. The search warrant for Roman's vehicle and the probable cause affidavit submitted in support of the search warrant in that drug possession case were admitted into evidence for purposes of the hearing as State Exhibit 68. The probable cause affidavit states that when HPD's Narcotics Tactical Team arrested Roman on February 2, 2022, they "seized [Roman's] vehicle, [which they believed] to have been involved in a homicide (case # 92993-22)" and Roman is "believed to be the only person that drives that vehicle." The HPD homicide investigation number listed on the probable cause affidavit is the same as the HPD case number included in Wiley's NamUs printout.

On cross-examination, Captain Alley testified that the last time she spoke to Wiley was when Wiley was served with a subpoena in 2021 for a prior trial date, and she did not know Wiley's current whereabouts. When asked if she knew whether Wiley was dead or alive, Captain Alley testified, "All I know is HPD is conducting a homicide investigation regarding her." Captain Alley testified that she learned of HPD's homicide investigation in March 2022, approximately six months before trial.

### 2. Laquida Sewell

Laquida Sewell, Wiley's mother, also testified for the State during the hearing. Sewell testified she learned that Wiley and 34-year-old Roman had been dating on November 29, 2019, Wiley's 17th birthday.[12] Sewell was concerned about the relationship because Roman is 17 years older than Wiley, who was only 16 years old when the relationship began. According to Sewell, Wiley moved out of Sewell's home in March 2021, and Sewell never heard from her again.

Sewell testified she had a good relationship with Wiley before Wiley moved out. When asked how the move occurred, Sewell testified, "One day I was at work and never heard from her." Sewell testified that she "[c]ouldn't get in contact" with Wiley and she "didn't know where she was." According to Sewell, Wiley's Facebook page had been taken down and no one had heard from her. When asked

---

[12]     Wiley's birthdate is November 29, 2002.

if she was "aware of any incidents of violence perpetrated by Mr. Roman against" Wiley, Sewell testified that Wiley told her that Roman slapped her once. According to Sewell, Wiley, who would have been 19 years old at the time of trial, was not the type of person to cut ties with her family. Sewell also testified that Wiley did not have any savings, a car, or the type of employment that would support a car payment when she lived with Sewell.

On cross-examination, Sewell testified that Wiley never told her of any incidents of physical violence other than the one time Roman slapped her. According to Sewell, Wiley "left with" Roman when she moved out of Sewell's home and she "didn't see [Wiley] until maybe a month later when [Wiley] came and got the rest of her stuff with two guys." When asked if she had any evidence that Roman was involved in Wiley's disappearance, Sewell testified, "Well, she left with him." Sewell had not been in contact with Wiley for over a year and a half and she "did not know the kinds of things that [Wiley] was involved in and who her associates were" because Wiley was "being kind of secretive."

On redirect examination, Sewell testified that Wiley's secretive behavior began after she started dating Roman. Sewell testified that the last time she saw Wiley was Mother's Day on May 9, 2021, and if Wiley had been in contact with any other family members, they would have told Sewell.

After hearing argument from Roman and the State, the trial court found by a preponderance of the evidence that the wrongdoing by forfeiture doctrine applied to Wiley's out-of-court statements. The trial court stated:

> Physical violence in the past, domestic violence in the past by itself is not by itself grounds for adopting 38.49, but there's more to this case than just the domestic violence. There was a history of domestic violence, but with this case there was an implied threat and I think a direct threat as well to commit serious bodily injury if Ms. Wiley talked about this, and I note that the timing of Ms. Wiley's statement, she gave her statement on October 29th, less than two weeks after the alleged shooting, and the threat that he had bail money to get out was clearly an indication that—to me that she was being threatened and felt threatened; therefore, I find that under the circumstances that there is a preponderance of the evidence, Article 38.49 will apply in this case.

When the State offered into evidence a redacted version of the written statement Wiley gave to Captain Alley on October 19, 2020, Roman objected to the admission of the statement on the grounds that "[i]t is hearsay," its admission "violates the Sixth Amendment confrontation clause," and it "unfairly prejudiced [Roman] by the surprise of the statement coming in with the witness not being available." The trial court overruled the objection and admitted Wiley's statement into evidence as State Exhibit 66.

## C.    Analysis

Roman argues the trial court abused its discretion in holding the doctrine of forfeiture by wrongdoing barred him from asserting his rights under the Sixth Amendment's Confrontation Clause and in admitting Wiley's out-of-court

29

statements into evidence. Among other things, the State argues Roman waived this issue on appeal due to inadequate briefing. Even assuming Roman properly briefed his first issue, he still does not prevail on the merits.

Roman argues the trial court abused its discretion because the State did not establish by a preponderance of the evidence that (1) Roman wrongfully procured Wiley's unavailability to testify at trial, (2) Wiley was unavailable because of Roman's wrongdoing, and (3) Roman intended to prevent Wiley from testifying. The State responds the trial court did not abuse its discretion because there is ample evidence supporting the trial court's finding that the doctrine of wrongdoing by forfeiture barred Roman from objecting to the admission of Wiley's out-of-court statement based on the Confrontation Clause.

The record reflects that Wiley gave a sworn statement to Captain Alley on October 29, 2020, less than two weeks after Wilson was shot. In her sworn statement, Wiley told Captain Alley that Roman took her to his home on October 25, 2020, and told her that "he was going to move [her] in with him." Roman interrogated Wiley about her past sexual partners and slapped her "twice in my face, and it hurt me." According to Wiley,

> I was shaking. I was so scared. This wasn't the first time [Roman] has hit me. [Roman] was telling me that he was going to break my jaw and paralyze me if I told anybody about what we were talking about.

Wiley told Captain Alley that she ran to a friend's home to get away from Roman. Roman kept Wiley's cell phone and, over the next four days, used the phone to call Wiley's sister and told her that Wiley "need[ed] to get [her]self together" and he had "been watching" Wiley. Wiley, who did not know where Roman's gun was located, was "scared to even go outside" and she quit her job. Wiley told Captain Alley that Roman "said if I tell the police about the shooting, that he has bail money." Captain Alley testified that Wiley appeared to be scared when she gave her statement.

In March 2021, five months after giving her sworn statement to Captain Alley, Wiley moved out of Sewell's home and she left with Roman. Wiley, who is not the type of person to lose contact with her family, has not spoken to Sewell since Mother's Day on May 9, 2021.

Roman's trial, originally scheduled for August 9, 2021, was reset for October 25, 2021. Wiley was served with a subpoena issued on September 22, 2021.[13] On October 15, 2021, ten days before Roman's trial, Wiley posted on her social media account that she and Roman were married.[14] Five days later, Roman filed a second motion for continuance and the trial was reset for April 25, 2022. Wiley disappeared in January 2022, before the State could serve her with a subpoena for the new trial

---

[13]     The subpoena is not included in the appellate record and the record does not reflect the date Wiley was served with the subpoena.

[14]     *See Brown v. State*, 618 S.W.3d 352, 356 (Tex. Crim. App. 2021) (observing other courts have "held that marrying the witness can constitute wrongdoing, if done so that the witness can invoke a spousal privilege against testifying").

setting.  HPD is investigating Wiley's disappearance as a possible homicide and Roman is a suspect in the case.

The record thus contains evidence that Roman, who previously assaulted Wiley, slapped Wiley's face nine days after Wilson was shot in the shoulder and threatened to break Wiley's jaw and paralyze her if she told anyone about the shooting.  Roman also indirectly threatened to physically harm Wiley when he told Wiley's sister that he was watching Wiley, and that if she talked to the police about the shooting, "he has bail money."

Viewed in the light most favorable to the trial court's ruling, this evidence supports an inferential connection between Roman's direct and implied threats of violence against Wiley should she talk to the police about the robbery and shooting, and Wiley's eventual unavailability at Roman's trial.  *See Brown*, 618 S.W.3d at 358 (stating history of family violence directed at witness in combination with evidence defendant "issued any threats or engaged in conduct otherwise designed to control" witness is evidence defendant intended for threats to cause witness to be absent from trial and resulted in witness' unavailability for trial); *see also Byrd*, 2022 WL 2719060, at *6 (stating when assessing evidence regarding acts alleged to have procured witness' unavailability, we draw all reasonable inferences in favor of trial court's finding) (citing *Brown*, 618 S.W.3d at 357).  There is thus some evidence supporting the trial court's finding that Roman engaged in wrongdoing that was

32

intended to, and did, procure Wiley's unavailability for trial by directly and indirectly threatening her with physical harm if she talked to the police about the robbery and shooting. *See Brown*, 618 S.W.3d at 357 ("[C]ourts have recognized that procurement or causation need not be proven directly, but may be established by inference."). In light of this evidence, we cannot say that the trial court abused its discretion by finding by a preponderance of the evidence that the doctrine of forfeiture by wrongdoing applied and thus Roman was barred from objecting to the admission of Wiley's out-of-court statements based on the Confrontation Clause. *See Shepherd*, 489 S.W.3d at 572 (reviewing forfeiture by wrongdoing doctrine finding under abuse of discretion standard applicable to admission of evidence); *see also Osbourn*, 92 S.W.3d at 538 (stating trial court does not abuse its discretion by admitting evidence if there is some evidence to support trial court's decision).

Roman argues that the doctrine of forfeiture by wrongdoing does not apply because the evidence supports alternative inferences for Wiley's failure to appear at trial. According to Roman, Wiley's role in Wilson's shooting is "unclear," and he posits that Wiley may have "exaggerated her written statement to deflect from herself" and she "disappeared to avoid confronting her own culpability [with respect to Wilson's robbery and shooting] or simply to get away from her circumstances to start [a] new life in a different place away from her past bad acquaintances and memories." In an Article 38.49 hearing, the trial court is the sole trier of fact and

33

judge of the credibility of the witnesses and the weight to be given their testimony and the evidence. *See Schindler*, 2018 WL 4924946, at *6 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). To the extent the record supports alternative inferences regarding Wiley's unavailability to testify at trial, we must defer to the trial court's resolution of any conflicting inferences. *See Byrd*, 2022 WL 2719060, at *6; *see also Byrd*, 2022 WL 2719060, at *6 (stating when assessing evidence regarding acts alleged to have procured witness' unavailability, appellate courts draw all reasonable inferences in favor of trial court's finding) (citing *Brown*, 618 S.W.3d at 357).

We hold the trial court did not abuse its discretion by finding that the doctrine of forfeiture by wrongdoing barred Roman from objecting to the admission of Wiley's out-of-court statements based on the Confrontation Clause or by admitting Wiley's written statement into evidence over Roman's Confrontation Clause objection. *See Colone*, 573 S.W.3d at 264–65 (stating defendant who wrongfully procures witness' unavailability cannot later challenge admission of witness' out-of-court statements because witness is unavailable for cross-examination).

**D.     Harmless Error**

We agree with the State that even if the trial court abused its discretion by holding the doctrine of forfeiture by wrongdoing applied and admitting Wiley's out-of-court statement into evidence, the error was harmless because (1) the same or

similar evidence was admitted without objection, (2) Wiley's statement was only one piece of the evidence corroborating Wilson's testimony that Roman shot him in the shoulder while attempting to rob him, and (3) Roman relied on Wiley's statement to support his defensive theory that Wilson, who provided direct evidence of the offense, was neither credible nor deserving of justice.

Wilson's testimony was the key evidence at trial that established the elements of the offense of aggravated robbery.[15] Wilson testified that he made arrangements to meet Wiley in the parking lot of her apartment building and have sex with her in his SUV in exchange for money. After he got off work, Wilson drove to Wiley's apartment building, parked in the parking lot, and waited in his SUV for Wiley. Wiley got in the front passenger seat of Wilson's SUV and then reached back and unlocked the back passenger-side door. Roman, who was wearing a black baseball cap and glasses, climbed into the backseat, tased Wilson, and demanded money from

---

[15] To establish that Roman committed the offense of aggravated robbery as alleged in the indictment, the State was required to prove that Roman, while in the course of committing theft of property owned by Wilson, and with intent to obtain and maintain control of the property, intentionally and knowingly threatened and placed Wilson in fear of imminent bodily injury and death while using and exhibiting a deadly weapon, namely, a firearm. *See* TEX. PENAL CODE § 29.03(a)(2) (defining elements of aggravated robbery with deadly weapon); § 29.02(a)(2) (defining elements of robbery); *see also id.* § 1.07(17)(A) (defining "deadly weapon" to include firearm). A person commits theft if he appropriates property without the owner's consent and with intent to deprive the owner of the property. *Id.* at § 31.03(a), (b)(1). "'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* at § 29.01(1).

him. Roman and Wilson fought for control of the taser in the backseat of the SUV and when the taser dropped to the floor, Roman pulled out his pistol and shot Wilson in the shoulder. Roman ran away after the shooting. The physical evidence collected from inside Wilson's SUV, including the black baseball cap, eyeglasses, stun baton, fired shell casing, and the bullet patterns corroborates Wilson's testimony.

Wiley gave a similar account in her sworn statement to Captain Alley, corroborating much of Wilson's testimony. According to Wiley, Roman told her to text Wilson and tell him that she would have sex with him "for $140, so that [she] could get [her] hair done." When Wilson arrived at Wiley's apartment building, Wiley sat down in the front passenger seat of Wilson's SUV and then unlocked the rear passenger side door for Roman. Wiley knew that Roman was bringing his pistol, but she did not know that he had a taser. According to Wiley, Roman got in the SUV through the unlocked door and he and Wilson "started wrestling in the back seat." Wiley could not see anything, but she "heard like three gunshots" and then Roman yelled at Wiley to unlock the door. Wiley unlocked the doors and she and Roman got out of Wilson's SUV before Wilson drove away.

A summary of Wiley's statement was included in Webb's probable cause affidavit, which was admitted into evidence without objection as State Exhibit 63. In his affidavit, Webb stated:

> Roman had Wiley contact Wilson to arrange a meeting because he was going to make Wilson "come to an understanding about stopping him

from calling her". Wiley told Alley that she knew he had a pistol but didn't know anything about him having a taser. Roman had told Wiley to bring a towel when she went to Wilson's vehicle so he could wrap up his pistol with it when he was through. Roman later told Wiley that he would break her jaw and leave her paralyzed if she told the police what he had done.

During closing arguments, the State argued that Wilson's testimony proved that Roman committed aggravated robbery when he demanded money from Wilson and shot Wilson in the shoulder. According to the State, Wiley's statement, the physical evidence collected from the SUV, and the testimony of the officers and experts merely corroborated Wilson's testimony.

Despite his objections, Roman relied heavily on Wiley's out-of-court statement in his closing argument to support his defensive theory that Wilson was a deceitful sexual predator who could not be trusted to tell the truth. Roman argued that Wilson lied to the jury when he denied sexually assaulting Wiley, having sex with her before her 17th birthday, and going inside her apartment, because Wiley told Captain Alley that Wilson had done each of those things. Roman also argued that Wilson's testimony that Roman demanded money from him was not credible because Wiley did not say anything about a robbery in her statement.

The record thus reflects that the same or similar material facts included in Wiley's out-of-court statement about the shooting and robbery were admitted without objection through Wilson's testimony and Investigator Webb's probable cause affidavit. *See Sanders v. State*, 422 S.W.3d 809, 818 (Tex. App.—Fort Worth

37

2014, pet. ref'd) (holding any error in admission of statement in violation of defendant's right to confrontation was harmless because other unobjected-to evidence established same facts). While Wiley's out-of-court statement played a supporting role in the State's case as one of several pieces of evidence corroborating Wilson's testimony, Wiley's allegations against Wilson were an important component of Roman's defense, because they directly contradicted portions of Wilson's testimony, undermining his credibility, and Wiley's statement was the only evidence that Wilson had sexually assaulted Wiley and had sex with her when she was underage.

Thus, even if Wiley's out-of-court statement was admitted erroneously, the admission of this evidence was not harmful because the same or similar facts were admitted elsewhere without objection, Wiley's statement was not an important part of the State's case, Roman used Wiley's statement case to support his defensive theory that Wilson was neither credible nor deserving of sympathy, and Wiley's statement did not significantly contribute to the strength of the prosecution's case. *See id.*; *Johnson v. State*, No. 14-22-00050-CR, 2023 WL 5217800, at *5 (Tex. App.—Houston [14th Dist.] Aug. 15, 2023, no pet.) (mem. op., not designated for publication) (holding admission of expert witness testimony harmless because "it was not particularly important to the State's case, it assisted appellant's case in corroborating appellant's self-defense theory, there was no evidence contradicting

[expert's] conclusions, and it did not significantly contribute to the strength of the prosecution's case").

For these reasons, we conclude beyond a reasonable doubt that to the extent the admission of Wiley's out-of-court statement was erroneous, it did not materially affect the jury's deliberations. *See Scott*, 227 S.W.3d at 690.

We overrule Roman's first issue.

### Charge Error

In his second issue, Roman argues the trial court erred in failing to include a verdict form for the lesser included offense of aggravated assault because the body and the application paragraph of the charge include language instructing the jury on aggravated assault and thus the omission of the verdict form was "confusing and misleading" for the jury. But as the State points out, the jury charge does include a verdict form for the lesser-included offense of aggravated assault.

The submitted charge instructed the jury regarding the offenses of aggravated robbery, aggravated assault, and unlawful possession of firearm by a felon. In relevant part, the jury charge states:

**Count II – Aggravated Robbery**

. . .

**Application of Law to Facts**

Although the state has charged the defendant with the offense of aggravated robbery, you may find the defendant not guilty of that

charged offense but guilty of a lesser included offense. In this case, the offense of aggravated assault is a lesser included offense of the charged and greater offense of aggravated robbery.

You may discuss the two offenses in any order you choose, starting with the offense of aggravated robbery or the offense of aggravated assault.

In deciding the defendant's guilt or innocence, however, you should first address whether the state has proved the charged offense of aggravated robbery. If you find the defendant guilty of aggravated robbery, you should so indicate on the verdict form.

To find the defendant guilty of aggravated robbery, you must determine whether the state has proved, beyond a reasonable doubt, four elements. The elements are that-

1. the defendant, in Colorado County, Texas, on or about October 16, 2020, intentionally, knowingly or recklessly caused bodily injury to Craig Anthony Wilson by shooting Craig Anthony Wilson with a firearm; and

2. the defendant did this in the course of committing theft of property owned by Craig Anthony Wilson; and

3. the defendant had the intent to obtain or maintain control of the property that was the subject of the theft; and

4. the defendant used or exhibited a deadly weapon, a firearm.

You must all agree on elements 1, 2, 3, and 4 listed above. If you all agree the state has proved, beyond a reasonable doubt, each of the four elements listed above, you must find the defendant "guilty" of aggravated robbery and so indicate on the attached verdict form, titled "Verdict-Guilty of Aggravated Robbery."

If you all agree the state has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, 3 and 4 listed above, you must find the defendant "not guilty" of aggravated robbery.

40

If you find the defendant is not guilty of aggravated robbery, or if after all reasonable efforts to do so you are not able to reach a unanimous verdict on the charged offense of aggravated robbery, you should next address whether the state has proved the lesser included offense of aggravated assault. If you find the defendant guilty of aggravated assault, you should so indicate on the appropriate verdict form, titled "Verdict-Guilty of Aggravated Assault."

To find the defendant guilty of aggravated assault, you must determine whether the state has proved, beyond a reasonable doubt, three elements. The elements are that–

1. the defendant in Colorado County, Texas on or about October 16, 2020, caused bodily injury to Craig Anthony Wilson by shooting Craig Anthony Wilson with a firearm; and

2. the defendant did this either—

   a. intending to cause bodily injury; or

   b. knowing that he would cause bodily injury; or

   c. with recklessness about whether he would cause bodily injury; and

3. the defendant used or exhibited a deadly weapon during the alleged assault.

You must all agree on elements 1, 2, and 3 listed above.

If you all agree the state has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, and 3 listed above, you must find the defendant "not guilty."

If you all agree the state has proved, beyond a reasonable doubt, each of the 3 elements above, you must find the defendant "guilty" of aggravated assault.

And the verdict form states:

## COUNT II – AGGRAVATED ROBBERY

**(Choose One)**

### VERDICT—NOT GUILTY OF AGGRAVATED ROBBERY

We, the jury, find the defendant, JOHN ALBERTO ROMAN, not guilty.

_____

Foreperson of the Jury

_____

Printed Name of Foreperson

### VERDICT—GUILTY OF AGGRAVATED ROBBERY

We, the jury, find the defendant, JOHN ALBERTO ROMAN, guilty of Aggravated Robbery, as charged in the indictment.

_____

Foreperson of the Jury

_____

Printed Name of Foreperson

### VERDICT—GUILTY OF AGGRAVATED ASSAULT lesser included offense

We, the jury, find the defendant, JOHN ALBERTO ROMAN, not guilty of Aggravated Robbery as charged in the indictment, but guilty of the lesser offense of Aggravated Assault.

_____

Foreperson of the Jury

_____

Printed Name of Foreperson

Although the jury charge does not include a "NOT GUILTY" verdict form for the lesser-included offense of aggravated assault, Roman is not challenging this on

42

appeal. Rather, his challenge is based on his mistaken belief that the charge did not include *any* verdict form for the offense of aggravated assault.

Were we to construe Roman's appellate argument liberally as challenging the omission of a "NOT GUILTY" verdict form for the lesser-included offense of aggravated assault, he still would not prevail because assuming without deciding that the charge is erroneous, the error is harmless.

We may only reverse for charge error if the error is harmful. *See Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020); *see also* TEX. CODE CRIM. PROC. art. 36.19 (stating trial court's judgment should not be reversed unless record shows jury charge error was calculated to injure defendant's rights, or unless record demonstrates defendant did not have fair and impartial trial). The level of harm necessary for reversal depends on whether the appellant properly objected to the error. *Jordan*, 593 S.W.3d at 346 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). If the appellant preserved the error, we review the charge error under the "some harm" standard. *See Jordan*, 593 S.W.3d at 346 (citing *Almanza*, 686 S.W.2d at 171). "Some harm" means "actual harm and not merely a theoretical complaint." *Jordan*, 593 S.W.3d at 347. If error is not preserved, we review the error under the more stringent "egregious harm" standard. *See id.* at 346 (citing *Almanza*, 686 S.W.2d at 171).

43

Most of the charge conference was conducted off the record. During the portion of the charge conference reflected in the record, the trial court asked Roman if he had any objections to the charge, and Roman's counsel replied, "We object only to that portion of the charge relating to the lesser included offense of aggravated assault." The trial court stated the objection was "[d]uly noted and overruled." The record thus does not reflect that Roman objected to the omission of a "not guilty" verdict form for the lesser-included offense of aggravated assault. *See Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020) (stating appellant has "burden to bring forth a record showing that error was preserved"); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (appellate issue "must correspond to the objection made at trial"). As such, we may reverse only if the omission of a "NOT GUILTY" verdict form for the lesser-included offense of aggravated assault resulted in egregious harm. *See Jordan*, 593 S.W.3d at 346 (citing *Almanza*, 686 S.W.2d at 171).

Having been properly instructed on the law applicable to the greater offense of aggravated robbery and the lesser-included offense of aggravated assault, the jury found Roman guilty of the greater offense of aggravated robbery. *See generally Hawk v. State*, No. 05-98-00697-CR, 2000 WL 1682996, at *5 (Tex. App.—Dallas Nov. 10, 2000, pet. ref'd) (mem. op., not designated for publication) ("By finding appellant guilty of the charged offense, the trial court implicitly rejected finding

appellant guilty of a lesser-included offense."). The jury's finding of guilty with respect to the greater offense supports the conclusion that Roman was not egregiously harmed by the omission of a "NOT GUILTY" verdict form for the lesser-included offense. *See Render v. State*, 316 S.W.3d 846, 854 (Tex. App.—Dallas 2010, pet. ref'd) ("The fact that the jury convicted appellant of the greater offense supports the conclusion that appellant was not egregiously harmed by the omission of a not guilty verdict form [for the lesser included offense]."); *see also Castillo v. State*, No. 10-09-00286-CR, 2011 WL 5221238, at *4 (Tex. App.—Waco Oct. 26, 2011, pet. ref'd) (mem. op., not designated for publication) (same).

Roman does not dispute that there is sufficient evidence to support his conviction for the greater offense of aggravated robbery. Roman pled "true" to the enhancement allegation, and after finding the allegation to be "true," the jury assessed Roman's punishment at 99-years' confinement for the greater offense of aggravated robbery. Because the jury found the enhancement allegation to be true, Roman's punishment range for the greater offense of aggravated robbery was no less than fifteen years and no more than ninety-nine years or for life and the punishment range for the lesser-included offense of aggravated assault was no less than five years and no more than ninety-nine years or life. Thus, Roman was facing the same maximum sentence regardless of whether he was convicted of aggravated robbery or aggravated assault. Because the jury assessed Roman's punishment at 99 years'

45

confinement, this factor weighs against egregious harm. *See Vasquez v. State*, 389 S.W.3d 361, 368–69 (Tex. Crim. App. 2012) (stating courts may consider entire jury charge, state of evidence, arguments of counsel, and other relevant information revealed by trial record of trial when evaluating error for egregious harm).

In light of the above, we conclude that even if the omission in the jury charge of a "NOT GUILTY" verdict form for the lesser-included offense of aggravated assault was erroneous, the error did not result in egregious harm to Roman.

We overrule Roman's second issue.

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Goodman, Rivas-Molloy, and Guerra.

Do Not Publish. TEX. R. APP. P. 47.2(b).